```
                                                            1
 1                  UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,       )
                                     )
 5            PLAINTIFF,             )    CASE NO. 2:15-CV-95-1
                                     )
 6      vs.                          )
                                     )
 7   ABDIRAHMAN SHEIK MOHAMUD,       )
                                     )
 8            DEFENDANT.             )
     _____)
 9

10                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES L. GRAHAM
11             FRIDAY, AUGUST 18, 2017; 11:00 A.M.
                        COLUMBUS, OHIO
12

13      APPEARANCES:

14      FOR THE PLAINTIFF:
             Benjamin C. Glassman
15           United States Attorney
             By:  Douglas W. Squires, AUSA
16           303 Marconi Blvd., Second Floor
             Columbus, OH 43215
17
        FOR THE DEFENDANT:
18           Samuel H. Shamansky Company, LPA
             By:  Samuel H. Shamansky, Esq.
19           By:  Julie G. Keys, Esq.
             523 S. Third Street
20           Columbus, OH 43215

21                           - - -

22

23        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
24
             DENISE N. ERRETT, FEDERAL OFFICIAL COURT REPORTER
25                        (614) 719-3029
```

```
 1                    FRIDAY AFTERNOON SESSION
 2                       AUGUST 18, 2017
 3                            - - -
 4         (The following proceedings were had in open court.)
 5         THE COURT:  Good morning, Counsel.  Good morning,
 6   ladies and gentlemen.
 7         MR. SQUIRES:  Good morning, Your Honor.
 8         MR. SHAMANSKY:  Good morning, Your Honor.
 9         THE COURT:  Mrs. Shane, you may call this case.
10         COURTROOM DEPUTY CLERK:  2:15-CR-095-1, the United
11   States of America versus Abdirahman Sheik Mohamud.  The
12   Defendant will come forward.
13         (Whereupon, the Defendant and his Counsel step up to
14   the lecturn.)
15         THE COURT:  Are you Abdirahman Sheik Mohamud?
16         THE DEFENDANT:  Yes, Your Honor.
17         THE COURT:  And, Defense Counsel, please enter your
18   appearances.
19         MR. SHAMANSKY:  Good morning, Your Honor.  Sam
20   Shamansky and Julie Keys on behalf of the Defendant.
21         THE COURT:  Very well.  Thank you.  Good morning.
22         And, Mr. Mohamud, these are your lawyers; is that
23   correct?
24         THE DEFENDANT:  Correct.
25         THE COURT:  And the Court will recognize the United
```

1  States Assistant United States Attorney assigned to this case,
2  Mr. Douglas Squires.
3        Good morning, Mr. Squires.
4        MR. SQUIRES:  Good morning, Your Honor.
5        THE COURT:  Mr. Squires, what is the status of this
6  case?
7        MR. SQUIRES:  Your Honor, on August 14th of 2015, the
8  Defendant, Abdirahman Sheik Mohamud, entered a plea of guilty
9  to three counts of an indictment as charged.  That includes
10 providing material support to terrorists, in violation of Title
11 18, United States Code, Section 2339A; providing material
12 support to a designated foreign terrorist organization, in
13 violation of Title 18, United States Code, Section 2339B; and
14 making false statements related to terrorism, in violation of
15 Title 18, United States Code, Section 1001(a)(2).
16       The Defendant is now before the Court for sentencing.
17 The Defendant and, both, the government have filed sentencing
18 memos, Your Honor.
19       THE COURT:  Very well.  Thank you, Mr. Squires.
20       Counsel, I've read the Presentence Investigation
21 Report.  Are there any objections to the report, Mr. Shamansky?
22       MR. SHAMANSKY:  No, Your Honor.
23       THE COURT:  Very well.
24       Mr. Squires?
25       MR. SQUIRES:  There are none, Your Honor.

1        THE COURT:  Very well.

2        Since there are no objections, the Court will adopt
3   the findings and conclusions of the probation officer.  And
4   that leads to these determinations:  that the total offense
5   level in this case is 43, and the criminal history category is
6   VI.

7        Are there any objections to those determinations?

8        MR. SHAMANSKY:  No, sir.

9        THE COURT:  Mr. Shamansky?

10       MR. SQUIRES:  Not by the government.

11       THE COURT:  Very well.

12       Those findings yield a guideline sentence in this case
13  of 456 months.  And it's not a sentencing range.  It is a
14  guideline sentence.  However, the Court has been presented with
15  a number of arguments from both sides which would, if adopted,
16  lead the Court to a decision to impose a sentence that is
17  somewhat less or perhaps significantly less than called for by
18  that guideline.

19       In arriving at a sentence, the Court is called upon to
20  begin with consideration of the Federal Sentencing Guidelines,
21  but that's the beginning of the Court's determination.  In
22  addition to the guidelines, the Court is called upon to
23  consider the nature and circumstances of the offense, the
24  history and characteristics of the defendant, the need for the
25  sentence to reflect the seriousness of the offense and promote

1  respect for the law and provide just punishment, the need for
2  the sentence to afford adequate deterrence, and the need for
3  the sentence to protect the public from more crimes by the
4  defendant.  And closely related is the issue of deterrence in
5  order to protect the public from more crimes by individuals
6  similarly motivated and similarly situated to this defendant
7  who may be inclined to engage in the same kind of criminal
8  activity.
9         Now, this case involves a young man and his brother
10  who joined a terrorist organization and engaged -- in the
11  brother's case, engaged in jihadist warfare in the country of
12  Syria and which this defendant provided material support for
13  and then later made false statements to the FBI regarding the
14  nature of his activities and his trip to Syria to aid in those
15  terrorist activities.
16         And the facts before the Court indicate that Mr.
17  Mohamud then returned to Syria, or returned from Syria, to the
18  United States, for the express purpose of committing terrorist
19  acts in the United States against officers, either members of
20  the United States Army or other individuals involved in
21  government service in the United States, and that he took
22  active steps to recruit others to assist him and, in fact, did
23  recruit others to assist him, and that they engaged in practice
24  and training for a terrorist attack in the United States,
25  including going to a local firing range and learning how to

6

fire weapons. And their plan, conceived by this defendant, was to, in his words, murder five or six United States soldiers execution style. So this case presents -- this is a serious case, to say the least, and it presents the Court with some very troubling issues.

The Court's mission in sentencing, in a criminal case in general and in this case in particular, is to arrive at a sentence that is sufficiently severe but no more severe than necessary to afford adequate deterrence to the defendant and to others similarly inclined and to protect the public. This is an awesome responsibility for any court. And to arrive at a sentence in a case of this kind, which is sufficient to protect the public, is profoundly challenging.

I have spent many hours reflecting on the facts of this case, and I've read, and re-read, the Presentence Investigation Report. I have read the sentencing memoranda provided by Defense Counsel and by the United States. I also have a motion from the United States which contains additional information; but after groping with these issues for some considerable time, I have concluded that I am not yet in possession of sufficient information to feel comfortable in arriving at a sentence and determining what sentence would be appropriate in order to protect the public. And I have a number -- I have a list of a number of matters that I'd like some further information about.

1       We start with the fact that Mr. Mohamud was raised in
2  the United States.  He came here as a small child, age one or
3  two, spent his childhood and adolescence and the beginning of
4  his adulthood here in Columbus, Ohio.  According to Defense
5  Counsel's memorandum, he was raised in a caring and loving
6  home, which provided him and his siblings with a safe and
7  stable home environment, and that he had the love and support
8  of a close-knit family, that his mother instilled values of
9  honesty and respect and attempted to provide each of her
10 children with the best education available.  And, indeed, as a
11 result of her efforts, his brother, Aden, graduated from Ohio
12 State University, and his sister, Ijabo, is currently enrolled
13 in undergraduate classes, and he has another brother in high
14 school.
15      His brother Aden, who graduated from Ohio State
16 University, was the one who inspired him to engage in these
17 terrorist activities.  His brother Aden traveled to Syria to
18 fight for Al-Nusrah, a designated terrorist organization.  And
19 Mr. Mohamud chose to join his brother in those activities.
20      His brother was killed in Syria in fighting there.
21 And after his brother was killed, Mr. Mohamud returned to the
22 United States with the intent to engage in terrorist
23 activities, here, directed against citizens and officers of the
24 United States.
25      Mr. Mohamud was stopped for a traffic violation and

8

1  provided his brother's ID.  And his brother's name was on a
2  list of individuals under suspicion for engaging in terrorist
3  activities.  And, as a result, Mr. Mohamud was asked questions
4  by the FBI regarding his activities, and he lied to the FBI and
5  covered up his activities.
6           Later, the agents learned that he had engaged in
7  online communications with his brother in Syria and that they
8  discussed plans for Mr. Mohamud to travel to Syria to engage in
9  fighting there.  In one of these communications, Mr. Mohamud
10 said to his brother that shooting a rifle brings one, quote,
11 closer to Jannah, end quote.  This is the Arabic word for
12 "paradise" or "heaven."  And he expressed his desire to join
13 his brother, quote, in the high ranks as a mujahideen.  And
14 this term refers to fighters engaged in violent jihad, which
15 include acts of physical violence, murder, and maiming.
16          In another conversation, he told another individual
17 that he was happy for his brother, who was in Syria fighting,
18 and that he was going to join him soon; and he talked about
19 engaging in violent acts there.  And he did join his brother
20 there.  He purchased a ticket for a flight from the United
21 States to Athens which involved a stop in Istanbul, Turkey.
22 And he left that flight in Istanbul, instead of completing the
23 trip to Athens, and stayed in Turkey and joined up with
24 individuals involved in the Al-Nusrah Front and was able to
25 link up with his brother.

9

1                   While he was in Syria, he had a conversation with a
2       high-ranking jihadist, who instructed him to return to the
3       United States to carry out an act of terrorism because he had a
4       passport and lived in the United States for 19 years.  And Mr.
5       Mohamud had attained United States citizenship, and that's how
6       he was able to obtain a passport.  So, the plan was for him to
7       use his special qualities as a long-time resident of the United
8       States and one who was fluent in English and had a U.S.
9       passport and was, therefore, in a position to carry out these
10      kinds of activities and with less risk of detection.
11                  When he formed the intent to engage in this activity
12      here in the United States, he expressed his happiness about his
13      brother's death and stated that he was next and that he would
14      join his brother Aden soon.  He said that his plan upon
15      returning to the United States was to, quote, lay low and
16      recruit others for his plot.  And the plot was to obtain
17      weapons in order to kill military officers or other government
18      employees or people in uniform.  He said that he wanted to
19      execute something big, such as traveling to a military base in
20      Texas and killing three or four American soldiers execution
21      style.
22                  After returning to Columbus in September of 2014, Mr.
23      Mohamud and three other individuals went to a local gun range,
24      and he instructed two of them on how to shoot a handgun.  Long
25      before this, back in March of 2013, he posted various things on

1   social media, including the statement that we will never lose
2   to those pagen alawyits.  He posted a Facebook cover photo
3   showing the silhouette of a line of armed fighters with a man
4   holding what appeared to be the black flag used by the Islamic
5   State of Iraq, ISIL, and other terrorist organizations.  And
6   this flag symbolizes a war for the establishment of a
7   caliphate, which is a form of Islamic government led by a
8   caliph, or religious successor to the Prophet Mohammed.  He
9   posted these things before he obtained his United States
10  citizenship.
11          On February 18th of 2014, he appeared here in this
12  courthouse for a naturalization hearing and took an oath of
13  allegiance to the United States of America in which he swore
14  that he would support the Constitution of the United States and
15  that he would renounce and abjure absolutely and entirely all
16  allegiance and fidelity to any foreign prince, potentate, state
17  or sovereignty and that he would support and defend the
18  Constitution and laws of the United States against all enemies,
19  foreign and domestic.
20          When he took that oath, he lied, because he had
21  already made a commitment to engage in jihad with a known
22  terrorist organization which was fighting for the establishment
23  of an Islamic government and that he was joining an
24  organization which had been identified as a terrorist
25  organization by the United States Government.  So, the

11

1  challenge before this Court is to determine what sentence would
2  be sufficiently severe but no more severe than necessary to
3  deter Mr. Mohamud from any further activities of this kind and
4  to deter others similarly inclined from engaging in these kinds
5  of activities.
6        This kind of crime is much different than the ordinary
7  criminal case that comes before this Court.  And in order to
8  carry out my responsibilities, I feel that I need some
9  additional information.  And I would also solicit the
10 assistance of Counsel in providing some of this information.  I
11 have reached some tentative conclusions that I would like to
12 express and invite comment about.
13       I'm troubled with the issue of how to arrive at a
14 sentence that would deter an individual who has made a
15 commitment to violence and a violent organization and to carry
16 out acts of terrorism against citizens of the United States and
17 military officers of the United States from doing that,
18 particularly where this individual regards death in the process
19 of committing those crimes as an honorable way to die and one,
20 in fact, to be admired and emulated.
21       I believe that it would be proper to characterize this
22 kind of criminal activity as a hate crime.  This is a phrase
23 that certainly is familiar to all of us in light of recent
24 occurrences.  And if this is, in fact, a hate crime, that may
25 be an aggravating circumstance.

12

1  When Mr. Mohamud made the statement that he and his
2  brother were going to -- and those associated with them were
3  going to prevail in this violent activity against pagen
4  alawyits, I think that may be a reference to a religious sect
5  that was the object of violence and warfare because of their
6  religious beliefs, and that Mr. Mohamud's motivation was one of
7  anger and vitriol against a religious minority that he did not
8  agree with.  I am puzzled, however, about his motivation for
9  doing this in the United States against citizens of the United
10 States and soldiers of the United States, and I really am at a
11 loss, in view of his background and his upbringing, why he
12 would have developed this kind of hatred for citizens of the
13 United States and, in particular, members of its military.
14         I believe that his taking of the oath of citizenship
15 under false pretenses is also an aggravating circumstance which
16 the Court can consider in arriving at an appropriate sentence.
17 These are just two of the matters that have not been addressed
18 that the Court feels may be significant in arriving at a
19 sentence.
20         Mr. Mohamud is a member of the Somali community in
21 Columbus, Ohio.  Columbus has a very large Somali community.  I
22 believe approximately 30,000 citizens of this city are of
23 Somali origin.  It's probably the largest ethnic -- separate
24 ethnic group, of any kind, in this city.
25         The Court is puzzled about how Mr. Mohamud became

13

1  radicalized, how he and his brother, who graduated from Ohio
2  State University, became radicalized.  Was there coercion
3  involved, somehow, that the Court should consider as a
4  mitigating circumstance?  Were there pressures of some kind
5  applied to him?  How and why did he and his brother reach this
6  state of mind?
7          I'd like to know a little more about the Somali
8  community and its leadership and how its leaders, particularly
9  its religious leaders, and the community would react to this
10 kind of radicalization, whether it's condoned or whether it's
11 condemned.  That would give the Court some better grasp of the
12 issue of recidivism and would help the Court in arriving at a
13 sentence that would accomplish the goal of protecting the
14 public.  I'm wondering if the government of the City of
15 Columbus has engaged in outreach and/or communication with the
16 Somali community about issues like this and whether there are
17 programs that might help someone like Mr. Mohamud, when he
18 returns to society, to help him refrain from this kind of
19 thinking.
20         I'm also concerned about rehabilitation, and I'd like
21 to have some information from the government regarding any
22 programs that the Bureau of Prisons may have that would address
23 the issue of radicalization, Islamic radicalization.  Is there
24 such a thing as a de-radicalization program?
25         We have various programs in the Bureau of Prisons that

14

1   the Court is aware of which are designed to rehabilitate
2   inmates.  And that would include the extensive programs for the
3   rehabilitation and treatment of sex offenders and similar
4   extensive programs for the treatment and rehabilitation of
5   people who are addicted to narcotics.  I'm wondering if there
6   is any program that specifically addresses radicalization.  I'm
7   wondering if there are any facilities available, post
8   imprisonment, to address these issues.
9           When this Court sentences someone to a term of
10  incarceration, it is always followed by a period of supervised
11  release.  It may be two years, five years, ten years, or
12  sometimes even for life in which that individual is supervised
13  and provided with facilities for rehabilitation and
14  periodically checked up on to determine whether or not they are
15  progressing with their rehabilitation.  I'm not sure whether
16  there is anything like that for this kind of problem.
17          I'm also concerned about Mr. Mohamud's current state
18  of mind, whether he has abandoned these beliefs and these
19  motives, or whether he still entertains them.  And I
20  really -- I feel the need for some assistance in determining
21  whether he has abandoned these beliefs.
22          In other situations, the Court could receive
23  assistance such as a referral for a psychological examination
24  to determine what a person's state of mind was.  This is
25  something that the Court has done in other kinds of cases.  I'm

15

1  thinking, again, of sex offenders.  And it's also true that
2  that kind of evaluation can be helpful in some fraud cases.
3  And I'm wondering if there is anything like that that's
4  available to the Court in a case like this.  I don't know
5  whether there is such a thing as a specialist in determining
6  whether a person is entertaining radical Islamic views or not
7  or whether they've been rehabilitated.  I'm thinking that it
8  might be of some value to the Court to have a psychological
9  examination made of Mr. Mohamud.  Or if there's some entity or
10 some person that's more competent than a psychologist or a
11 psychiatrist, I'd like to know about that.
12          I'd like to know a little bit more about our
13 immigration policies and programs and just what procedures Mr.
14 Mohamud went through in order to obtain United States
15 citizenship.  As a judge of this Court, I have presided over
16 many naturalization hearings.  So I know all about the oath of
17 citizenship, but I don't know much about the procedures that
18 precede that, and it might shed some light on Mr. Mohamud's
19 situation.
20          Now, I want to return to the first thought that I
21 expressed, and that is the Court's concern over being able to
22 adequately judge just what sentence would be sufficiently
23 severe but no more severe than necessary to protect the public.
24          The issue of Islamic extremism and terrorism is one
25 that is, certainly, a matter of national concern.  We are about

16

1  to observe the 16th anniversary of the 9/11 attack on the World
2  Trade Center buildings that killed 3,000 people and injured
3  over 6,000 more, including all of the passengers on four
4  airplanes and the destruction of the two buildings and the
5  death of 343 firefighters and 72 law enforcement officers.  And
6  those were the actions of 19 radical Islamists.
7          Here in Columbus, Ohio, on the campus of Ohio State
8  University, we had an incident involving a member of the Somali
9  community who ran down a group of pedestrians with his car and
10 then exited with a knife and attempted to attack them.  So the
11 Court's concern is as broad as a national concern and as narrow
12 as a very local concern, and it all centers around the unusual
13 position of a court in arriving at a sentence which is
14 sufficient to protect the public.  So I'm not going to proceed
15 any further with today's sentencing hearing until I have some
16 answers to some of these questions.
17         I would like to give Counsel the opportunity to
18 reflect on my comments, and then I would like to have another
19 hearing to discuss just how they might assist the Court in
20 receiving the additional kinds of information that I just
21 discussed.  So that will conclude this matter for today.
22         And, Counsel, we'll be scheduling a further hearing in
23 this case in the very near future.
24         And with that, Mrs. Shane, you may adjourn court.
25         COURTROOM DEPUTY CLERK:  Please rise.

17

1  (The proceedings were concluded at 11:45 a.m.)

2  - - -

7  C E R T I F I C A T E

9  I, Denise N. Errett, Official Court Reporter, do
10 hereby certify that the foregoing is a true and correct
11 transcript of the proceedings before the Honorable James L.
12 Graham, Senior Judge, in the United States District Court,
13 Southern District of Ohio, Eastern Division, on the date
14 indicated, reported by me in shorthand and transcribed by me.

S/Denise N. Errett
Denise N. Errett, RMR-FCRR
Official Federal Court Reporter

DATE:  August 18, 2017