UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,      )
                               )
  PLAINTIFF,                   )      CASE NO. 2:15-cr-95
                               )
                vs.            )
                               )
ABDIRAHMAN SHEIK MOHAMUD,      )
                               )
  DEFENDANT.                   )
_____  )


TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE JAMES L. GRAHAM
TUESDAY, AUGUST 29, 2017; 1:08 P.M.
COLUMBUS, OHIO

  FOR THE PLAINTIFF:
      Benjamin C. Glassman
      United States Attorney
      By:  DOUGLAS W. SQUIRES
      Assistant United States Attorney
      303 Marconi Boulevard, Suite 200
      Columbus, Ohio 43215

      U.S. Department of Justice
      National Security Division
      By:  LOLITA M. LUKOSE
      Trial Attorney
      Counterterrorism Section
      950 Pennsylvania Avenue, NW
      Washington, D.C. 20530

  FOR THE DEFENDANT:
      Samuel H. Shamansky Co., LPA
      By:  SAMUEL H. SHAMANSKY, Esq.
      523 South Third Street
      Columbus, Ohio 43215
                               - - -


Proceedings recorded by mechanical stenography,
transcript produced by computer.

Allison A. Kimmel, RDR, CRR, CRC
Official Court Reporter
614.719.3225

1          Tuesday Afternoon Session

2                August 29, 2017

3                    - - -

4     *(Defendant not present)*

5          THE COURT:  Good afternoon, ladies and gentlemen.

6          MR. SHAMANSKY:  Good afternoon, Your Honor.

7          MR. SQUIRES:  Good afternoon, Your Honor.

8          THE COURT:  Counsel, we are gathered here today to

9     discuss the issues that I raised a week or so ago at the

10    commencement of the sentencing hearing in this case, and I

11    threw out a lot of questions.

12         I have received some excellent assistance from our

13    probation office, and I believe each of you has the report

14    completed by United States Probation Officer Schal Boucher; am

15    I correct?  Mr. Squires?

16         MR. SQUIRES:  Yes, Your Honor.

17         THE COURT:  Mr. Shamansky?

18         MR. SHAMANSKY:  Correct, sir.

19         THE COURT:  Very well.  The Court notes the presence

20    of our chief United States probation officer, Mr. John Dierna.

21         Mr. Dierna, I understand you have some materials for me

22    that relate to this matter.

23         MR. DIERNA:  I do, Your Honor.  May I approach?

24         THE COURT:  Yes, you may approach.  Now, counsel, I

25    had requested some assistance from Mr. Dierna.  Some of the

1   documents that he has provided me may be confidential; and once

2   I've had an opportunity to analyze them, I'll determine just to

3   what extent they are appropriate for me to share for the

4   purposes of this matter.

5        I've learned that the Administrative Office of the

6   United States Courts' subdivision devoted to the United States

7   Probation Office has begun various studies and contemplated

8   some programs that address some of the issues that I had

9   raised, and I think that's some indication that the questions I

10   raised are questions that probably many other judges will be

11   dealing with now and in the future, and it's a developing area

12   of concern for the courts and for the probation office of the

13   United States, to properly carry out our dual missions of

14   protecting the public.

15        And so, Mr. Dierna, I want to -- I appreciate very much

16   your work in assembling this material for me.  I don't think

17   I'm going to be asking you any questions at this matter, and so

18   you are excused now if you wish to be excused.

19        I understand Ms. Boucher is here, and I will be asking

20   her some questions, I believe.

21        Now, I would like to hear from counsel, and this will

22   just be a wide-ranging discussion.  It's not going to be an

23   argument or a formal proceeding.  It's going to be an

24   opportunity for counsel for both sides to help me decide what

25   the next step in this case should be and how I should address

1    some of the issues that I've raised.

2        So I would like to start first with defense counsel,

3    Mr. Shamansky.

4        MR. SHAMANSKY:  Your Honor, if I might, counsel for

5    the Government and I had a phone call, as we promised last week

6    when we went through your checklist, and first and foremost,

7    with Karen's help, and subject to the Court's approval, we were

8    hopeful that you would request that Dr. Haskins, with whom

9    you've worked, I guess, in the recent past on a criminal case,

10   and she prepared a psychological report that was helpful to the

11   Court -- were she available, the parties believe she would be a

12   fine choice to conduct a psychological in this case.

13       THE COURT:  Well, that's very useful information,

14   Mr. Shamansky.  Is that correct, Mr. Squires?

15       MR. SQUIRES:  That is correct, Your Honor.

16       THE COURT:  I'm sure that one of the things I'll want

17   to do is to have a psychological evaluation conducted; and if

18   this is a person that both of you have confidence in, then that

19   will be a great weight in the Court's selection of an

20   individual to do this.

21       So very good.  Thank you, Mr. Shamansky.

22       MR. SHAMANSKY:  Your Honor, we also spoke, of course,

23   about the Court's concern vis-a-vis the Somali community.  I

24   was tasked with making some inquiries in that regard.  I've had

25   a prior relationship with the Somali Chamber of Commerce, as it

1  were, and I'm hopeful by the end of this week I'll have some

2  names to submit to Doug for his consideration and also the

3  Court's regarding whether or not this is -- at least my

4  client's condition is something that's approved or disapproved

5  of, how it's being dealt with within the community as per the

6  Court's concern.

7          THE COURT:  Excellent, excellent.  How would you

8  propose to provide that information?

9          MR. SHAMANSKY:  Well, Your Honor, we're working

10 cooperatively together.

11         THE COURT:  Excellent.

12         MR. SHAMANSKY:  So I was going to give it to Doug so

13 he can vet it with his colleagues, and then we would present it

14 to Karen for your approval.

15         THE COURT:  That's a good suggestion, Mr. Shamansky,

16 and it relates to some questions I'm going to be asking a

17 little later in these proceedings.

18     I have a very strong feeling that the Muslim community

19 has a very important role in these issues, and what I hope to

20 do is to find a way to work constructively with the Muslim

21 community in perhaps coming up with some programs that would be

22 rehabilitation programs for their adherents who become involved

23 in terrorist activity and have gotten involved in this jihadist

24 mentality.

25         MR. SHAMANSKY:  Yes, sir.

1    THE COURT:  So I don't think it's condoned in any way

2  by the general community, and I believe it's completely

3  inconsistent with the teachings of Islam, and -- so I think the

4  Muslim community and local religious leaders can be of great

5  assistance in these matters.

6    MR. SHAMANSKY:  Yes, sir.  I believe that we're all on

7  the same page in that regard, the royal "we" sitting on this

8  side of the courtroom.

9    THE COURT:  Excellent.

10    MR. SHAMANSKY:  And lastly, Your Honor, relative to

11  the city administration, as I thought about the concern the

12  Court had, what does the City of Columbus have to offer moving

13  forward, maybe from a prophylactic or preventative view.

14    It finally came to me yesterday.  One of our former city

15  prosecutors is now part of the administration.  He does a very,

16  very good job, and he works closely and directly with the

17  mayor's office, so that is one thing that I had not spoken to

18  Doug about, and his colleagues as well, but Adam Friedman is

19  the young man -- who is very involved in the community level.

20  He was city prosecutor with Richard Pfeiffer, Jr.  He's now

21  moved on to the Ginther administration, and I believe, without

22  sounding presumptuous, were we to ask, he would be happy to

23  assist in any way possible.

24    So those are the concerns that I was able to address,

25  and if we thought that it was appropriate that I address,

1   relative to the list that you had provided us.

2           THE COURT:  Excellent.  Following up on that

3   particular subject, that is, the city administration, have

4   either of you talked to any representative of the city

5   government?

6           MR. SQUIRES:  Your Honor, we have.  Mr. Gibson -- Joe

7   Gibson is here today as a Special Assistant United States

8   Attorney and also a Franklin County prosecutor, and he has

9   spoken with the City of Columbus, and we're gathering

10  information regarding a New Americans program that they have,

11  and what efforts they have to disseminate information within

12  those new populate in the immigrant communities.

13          THE COURT:  Excellent.

14          MR. SQUIRES:  We'll be talking with Mr. Shamansky and

15  will be making a similar report to Ms. Martin.

16          THE COURT:  Have either of you had any contact with

17  the city administration regarding any avenues of communication

18  that have been established between the city administration and

19  the Islamic community in Columbus?

20          MR. SHAMANSKY:  Your Honor, what I can tell you, at

21  least anecdotally, as you correctly pointed out, there's a

22  substantial Somali community here, and we see these individuals

23  every day at our municipal courthouse, so there's quite a

24  community.  And then there's a group of interpreters that work

25  very closely with them, assisting them through not only with

1   the language issues, but also with the customs and the laws and

2   everything that relates to being a good citizen, so -- again,

3   that's something we're working on.

4       I'm not saying I back-burnered it, but it's just --

5   given the Court's list, we were trying to prioritize as much as

6   possible.

7       So we have those resources available to us.  These are

8   folks who are hands-on in the community every single day.  They

9   do a terrific job.  So I'm hopeful that I'll be able to -- as I

10  not only speak to the religious personnel who are respected

11  within the community, but also the folks with the hands-on,

12  day-to-day experience with individuals -- that I will be able

13  to come up with names for the Court.

14      THE COURT:  Excellent.  Mr. Shamansky, I appreciate

15  that.

16      And I realize that a lot of this is not case-specific.

17  It doesn't really concern this specific case but is a much

18  broader concern of which this case is a part.

19      MR. SHAMANSKY:  Yes, sir.

20      THE COURT:  The reference to a New Americans program

21  is something that really expresses a thought that I had for

22  some time that might be an appropriate role for this Court to

23  have, and in the process of preparing applicants for

24  citizenship, to -- and perhaps even follow up with some basic

25  teachings on the principles of the American Constitution and

1   how they relate to religious liberty and the rights of all

2   citizens.  So I'll be really interested in learning what the

3   city has in mind along those lines.

4               MR. SHAMANSKY:  Yes, sir.

5               THE COURT:  All right.  Anything else, Mr. Shamansky?

6               MR. SHAMANSKY:  No.  Thank you, Judge Graham.

7               THE COURT:  All right.  Mr. Squires.

8               MR. SQUIRES:  Your Honor, along those lines, regarding

9   outreach efforts, the FBI has been working on a statement that,

10  in conjunction with Mr. Shamansky, we hope to get to the Court

11  regarding what outreach efforts the FBI has made since

12  approximately 2008, and a little earlier than that, to the

13  present day -- that being weekly, at least monthly contact in

14  some circumstances, contact with the Somalian community and

15  what outreach efforts have been made and what is the message

16  that's delivered.

17              I've personally been involved in some of those outreach

18  efforts in the last couple of years, and I'll be able to aid in

19  that description in that statement by saying what the U.S.

20  Attorney's office does in conjunction with the FBI.

21              THE COURT:  Very well.  I'm sure the FBI has a lot of

22  information and knowledge in this area.  Much of it, I'm sure,

23  would be not public information.  But they may very well be a

24  source of information about who the relevant leaders are in the

25  community and those who are capable of having an impact on the

opinions of the community and so forth.  So that would be helpful.

MR. SQUIRES:  Your Honor, I can say that regarding the specifics of the relevant leaders and the opinions, I don't believe that's something that they can get into because of the sensitive nature of the outreach.

It's a funny position to be a law enforcement officer but yet delivering information, so I don't know that we would be able to give that information back, but I know that Mr. Shamansky will be addressing those issues in his efforts in defining the community's position within the Somali immigrant community.

THE COURT:  All right.  Very well.  Anything else, Mr. Squires?

MR. SQUIRES:  Your Honor, you had questions regarding the immigration procedures and programs.

THE COURT:  Right.

MR. SQUIRES:  We are able to and would give to the Court, and also Mr. Shamansky, both the immigration documents, that is, how did Mr. Mohamud get his citizenship, and then related to that, how did he get his passport.

Because the passport was something that was used, obviously, for travel and what did he say on those -- on those documents in order to secure them.

The Court was concerned about what was told or not told

1   during that process, and we think we'll be able to objectively

2   provide those documents which we're seeking to have used as

3   evidence.  They are not always allowed to be used as evidence.

4          THE COURT:  That may be an appropriate part of a

5   supplemental presentence investigation report in this case; is

6   that what you would expect?

7          MR. SQUIRES:  That was our goal, and I hope that that

8   would happen if we were given permission to use those

9   documents.

10         THE COURT:  All right.  Very well.  What else?

11         MR. SQUIRES:  Your Honor, you talked about the Hate

12  Crime and the application of potentially U.S. Sentencing

13  Guideline 3A1.1.

14         Just taking a step back in the greater view of this, the

15  application of 3A1.4 does apply in this case.  That's the

16  terrorism guideline.

17         3A1.1 is what I would call more general:  Is a specific

18  religious or sect being targeted as a result of this crime?

19         We believe, just at first glance, that 3A1.4 subsumes

20  that, and it might be a factual, legal, and, frankly, a

21  practical reason why we wouldn't want to put that forward to

22  the Court.

23         We can state that position more clearly perhaps in a

24  Government sentencing memo, but it's the position of the

25  Government, after looking at a few Fourth Circuit cases and

1    district court cases, that that may not apply in this case.

2    THE COURT:  All right.  Well, my concern there was

3    whether one of the motivations for the activities that

4    Mr. Mohamud involved himself were -- represented a persecution

5    of a minority segment of Islam, specifically, the Alawite sect,

6    and that Mr. Mohamud was a member of the Sunni sect, and --

7    whether that's correct terminology, but he was a Sunni, and the

8    Alawites were viewed as heretics or people to be excluded from

9    the community and/or persecuted because of their religious

10   beliefs, and that's why I raised that.

11   All right.  What else?

12   MR. SQUIRES:  Your Honor, regarding the B.O.P.

13   de-radicalization, as the Court mentioned, I think Ms. Boucher

14   has more than adequately addressed that, and it's the position

15   of the United States that we concur that she both gave a

16   thorough and accurate summary of those programs.

17   THE COURT:  I'm wondering if there might be a

18   potential for developing a program that -- I don't know that it

19   would be appropriately called "de-radicalization" but more

20   appropriately called "rehabilitation" for young men and

21   women -- it seems like they are mostly young men and women --

22   that get involved in the jihadist mentality and contemplate

23   carrying out acts of terrorism.

24   We are -- I know that our probation office is providing

25   moral reconation therapy programs which really have some of the

1   same kinds of approaches that I think might be valuable here,

2   particularly if -- if, as I suspect, that this jihadist

3   mentality is not consistent with the teachings of Islam, that

4   there could be some component of assisting these individuals

5   who become involved in it to realize that it is not morally

6   acceptable under the teachings of Islam as well as the

7   standards of civilization.

8       So I don't know whether there could be such a program or

9   maybe there ought to be a division of the moral reconation

10   therapy program to include the subject of terrorism.

11       All right.  Go ahead.

12       MR. SQUIRES:  And then the last thing I have is just

13   in general, it's the mitigation of radicalization which would

14   be how did this happen, what motivated him, was he under some

15   coercive effect, and I believe that Mr. Shamansky is going to

16   be addressing that as part of his materials that we will be

17   jointly submitting to the Court.

18       THE COURT:  All right.  Very well.  Anything else,

19   Mr. Squires?

20       MR. SQUIRES:  No.  Thank you, Your Honor.

21       THE COURT:  Very well.  I appreciate your comments.

22   I've mentioned MRT, moral reconation therapy, as one of the

23   programs that the Court's probation office is involved with.

24       There are other kinds of programs that our probation

25   office has been using to address other kinds of aberrant

1   behavior, and -- programs like Alcoholics Anonymous, support

2   groups which consist of individuals who have some firsthand

3   experience with the problem, anger management programs, mental

4   health programs.

5        So there is a substantial precedent here for

6   rehabilitative programs directed to specific kinds of aberrant

7   behavior, and I just have a feeling that this particular kind

8   of aberrant behavior and criminal activity may be amenable to

9   rehabilitative programs like these others that are already in

10  effect.  We have sex offender treatment programs as well.

11       So there are a host of kinds of issues that result in

12  criminal activity that are now being addressed by

13  rehabilitative measures, and I'm hoping that that might be a

14  part of a program that could be implemented with regard to the

15  this kind of aberrant behavior.

16       Now, these kind of programs, it seems to me, would come

17  into play in the Bureau of Prisons, and there the focus would

18  be on prison inmates, but even more importantly is the matter

19  of the Court's probation office in supervising these

20  individuals once they are released from incarceration, and in

21  this case the Court would expect to impose a significant term

22  of supervised release.

23       And the terms and conditions of supervised release are

24  another area in which rehabilitative programs are often

25  required as part of the conditions of supervised release, so if

we can -- if we can find a program or our probation office can

come up with some ideas about rehabilitative programs and

approaches, then, of course, the Court could then include those

in the terms of its sentence of supervised release.

Now, one of the things that Ms. Boucher gave the Court

were some terms of supervised release that have apparently been

used by another probation office, specifically the probation

office of -- the federal probation office in Chicago, and they

are now currently involved in supervising some individuals

convicted of these kinds of terrorist offenses.

I was interested in seeing the suggestion of the

installation of software, computer software, to monitor

computer activities.  That's often done in sex offender cases,

and I think it could well be appropriate in a terrorism case

since I think it's frequently the case that individuals become

radicalized through the internet, and so computer monitoring

may very well be an important and appropriate condition of

supervised release in this case.

The condition requiring follow-up mental health

assessment is also a program that the Court would consider in

this case, and certainly there's a lot of precedent for doing

that in other kinds of criminal activities.

I think this kind of criminal activity would be

appropriate for follow-up mental health assessments; and

significantly, there's a suggestion that the use of periodic

1   polygraph examinations may be an appropriate condition of

2   supervised release, and it is done in other kinds of criminal

3   offenses, and in particular sex offender cases, and it may very

4   well be appropriate in this kind of case as well.

5          So these are some of the ideas that are circulating in

6   my mind now and which counsel may want to be thinking about as

7   well.

8          And I'm going to, of course, be -- I'll be relying upon

9   my probation officers to come up with these kinds of

10  suggestions for the conditions of supervised release, and I

11  would be happy to have comments from either side regarding this

12  part of my sentence, the supervised release part of the

13  sentence, and in particular formulating conditions that will

14  contribute to the goal of protecting the public.

15         Mr. Squires, would you like to comment on that?

16         MR. SQUIRES:  Your Honor, these specific areas,

17  minimizing -- monitoring computers, following up on mental

18  health assessments, and use of periodic polygraphs are

19  conditions that the Government has seen before and had no

20  previous objection to, and we have no objection in this case.

21         THE COURT:  Do you have any suggestions for other

22  programs of this kind?

23         MR. SQUIRES:  Not at this time, but exploring the

24  Court's concerns you've well articulated today, we'll

25  communicate with probation to see if we can come up with

1    others, as well as talking with the prosecutors and probation

2    officers who handle those specific cases.

3         THE COURT:  Now, one of the standard conditions of

4    supervised release in other criminal offenses is the

5    prohibition of association with other felons, and here I think

6    that would be quite appropriate in terms of association with

7    perhaps known and identified terrorist organizations or other

8    individuals who have been convicted of terrorist offenses or

9    who are identified as proponents or propagandists, if you will,

10   of terrorist ideology.

11        Any comments about that?

12        MR. SQUIRES:  Well, we're going to have to get back

13   with you because it does raise the potential freedom of

14   assembly and religion --

15        THE COURT:  I doubt that freedom of assembly would

16   apply to a known terrorist organization.

17        MR. SQUIRES:  That's correct.  But identified known

18   terrorist organizations -- if a mosque had previously been

19   identified or had a connection, would that be off-limits?  I'm

20   not sure, and I only raise it as an issue, and I know that

21   we'll get back to the Court on that.

22        THE COURT:  All right.  Well, obviously there are and

23   will always be constitutional limitations to the Court's

24   sentencing power; however, there are well-recognized exceptions

25   to some of these constitutional principles, including the

1  principle of freedom of association, and we certainly do that

2  in the case of felons associating with other felons, and I

3  would think that that same principle would apply with convicted

4  terrorists of associating with other convicted terrorists.  And

5  how far beyond that we can go, I don't know, but I would like

6  to have some input and guidance on it.

7          MR. SQUIRES:  Thank you, Your Honor.

8          THE COURT:  Mr. Shamansky, would you like to comment

9  on any of these things that I have just been discussing?

10         MR. SHAMANSKY:  Your Honor, I'm in agreement with the

11  Court's -- fully in agreement with the Court's position.  I do

12  have a question obviously about the use of polygraphs.

13         The question is -- I know how they work in sex cases.

14  Have you viewed pornography or have you not?  But how they

15  would be applicable in this case, I'm just starting to think

16  through.

17         You know, they are a useful -- useful law enforcement

18  tool.  They are also a useful defense lawyer tool, so --

19         THE COURT:  That's an excellent point, Mr. Shamansky.

20  Polygraph testing may be appropriate, but there probably need

21  to be some identified proper areas that it would be applied to.

22         MR. SHAMANSKY:  Yes, sir.  I think Dr. Haskins could

23  hopefully help us with that, in terms of the psychological

24  profile.  Do you have still have these tendencies?  What do you

25  think about?  What do you dream about?  I don't know where we

1  go.  I don't think it's a bad idea.  I'm just saying the

2  parameters.

3        THE COURT:  I agree with you, and I think what we

4  would need to do is very similar to the challenge we have with

5  restrictions on freedom of association, would be the area of

6  questioning which would be proper and which wouldn't be proper

7  in terms of a polygraph examination, but there are a couple of

8  things I can think of right off the top of my head that would

9  seem to be appropriate, such as monitoring through polygraph

10  examination compliance with limitations like use of a computer

11  and so forth.

12        MR. SHAMANSKY:  Yes, sir.

13        THE COURT:  And associations with known terrorist

14  organizations or communications with them.

15        So if the Court should consider imposing a periodic

16  polygraph examination or authorizing it as one of the terms of

17  supervised release, I think I need some help in defining the

18  proper parameters of such examinations, and I would appreciate

19  your help on that.

20        MR. SHAMANSKY:  And we can work together on that, of

21  course.

22        THE COURT:  All right.  Anything else, Mr. Shamansky?

23        MR. SHAMANSKY:  No.  Thank you, Judge Graham.

24        THE COURT:  All right.  Very well, very well.  Well,

25  counsel, I appreciate your help on this.  We all have some

1  additional work to do.

2      I'm going to be away for about two weeks; and when I'm

3  back, I would like to have another meeting like this, and I'm

4  hoping then that you can have your joint presentations

5  available for me.

6      Before I leave, I am going to issue an order for the

7  psychological examination, and then I'll -- I'm pretty sure I'm

8  going to accept your joint recommendation on the person to be

9  selected, so -- I want to get that done before I leave so that

10  the psychological evaluation is under way, because I don't want

11  to unduly delay sentencing in this case.

12      I want to make sure we're doing the best job we can, but

13  I also want to keep the case on track.

14      MR. SHAMANSKY:  We understand.

15      THE COURT:  Anything else that we can discuss today

16  that would be useful?

17      MR. SHAMANSKY:  No.  Karen might have a suggestion.

18      (Pause in proceedings.)

19      THE COURT:  Ms. Martin says that she had had some

20  discussions with you about jointly contacting Dr. Haskins to

21  see if she would be willing to do the exam.  I would like for

22  you to do that and then let us know immediately.

23      MR. SHAMANSKY:  We'll do that today, Your Honor.

24      MR. SQUIRES:  Thank you, Your Honor.

25      THE COURT:  Very well.  If you can get us that

1  information today, that will complete that part of the

2  proceeding today.

3          MR. SHAMANSKY:  Thank you.

4          THE COURT:  Anything else?

5          MR. SQUIRES:  No, Your Honor.

6          THE COURT:  Ms. Boucher, anything else?

7          PROBATION OFFICER BOUCHER:  Your Honor, I just wanted

8  to tell the Court that I do have some guidance from the

9  counterterrorism unit through the B.O.P.

10      We can actually call him directly, Your Honor, if you

11  have questions.  I have his cell phone number.

12          THE COURT:  Excellent.

13          PROBATION OFFICER BOUCHER:  So if you would like to do

14  that, I can give you the number.  I can assist you in doing

15  that.

16          THE COURT:  If you would give me a supplemental report

17  with that number, I would appreciate it very much.

18          PROBATION OFFICER BOUCHER:  Yes, Your Honor.

19          THE COURT:  All right.  Very well.

20      That will conclude today's discussion, and we will

21  reconvene as soon as I have returned to the bench.

22          MR. SHAMANSKY:  Thank you, Your Honor.

23          MR. SQUIRES:  Thank you, Your Honor.

24          THE COURT:  Very well.

25      (The proceedings were adjourned at 1:41 p.m.)

1        C E R T I F I C A T E

2

3            I, Allison A. Kimmel, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable James L. Graham, Senior Judge, in the

6    United States District Court, Southern District of Ohio,

7    Eastern Division, on the date indicated, reported by me in

8    shorthand and transcribed by me or under my supervision.

9

10

11                               s/Allison A. Kimmel
                                 Allison A. Kimmel, RDR, CRR, CRC
12                               Official Federal Court Reporter
                                 August 31, 2017
13

14

15

16

17

18

19

20

21

22

23

24

25