**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | No. 2:15-cr-00095 |
| v. | |
| | JUDGE GRAHAM |
| **ABDIRAHMAN SHEIK MOHAMUD,** a/k/a "Ayanle," | |
| Defendant. | |

## UNITED STATES PRESENTENCE STATUS REPORT

The United States of America, by and through the undersigned counsel, submits this presentence status report to address and supplement information for the Court. The Government may also file a supplemental sentencing memorandum.

Defendant Abdirahman Sheik Mohamud ("Mohamud") appeared before the Court for sentencing on August 18, 2017, after the preparation of a presentence investigation report. At that time, and again at a status conference on August 29, 2017, this Court indicated to the parties that it did not have sufficient information to determine a sentence. On October 10, 2017, a psychological evaluation by Dr. Kristen E. Haskins was filed under seal with the Court. (Doc. No. 131, 131-1). A supplemental addendum to the presentence report was submitted and is dated October 17, 2017. On October 23, 2017, the Court ordered that information counsel has obtained should be filed with the Court by November 1, 2017. (Doc. No. 133). The United States now submits this status report containing information which is relevant and material to the pending sentencing.

**1.      Conditions of Supervised Release**

This Court asked the parties about special conditions of supervised release that would be appropriate in this case.

This Court's selection of special conditions of supervised release is, of course, guided by the factors in 18 U.S.C. § 3553(a). *See* U.S.S.G. § 5D1.3; *United States v. Nixon*, 664 F.3d 624, 627 (6th Cir. 2011). In particular, any special condition of supervised release must be "reasonably related" to the § 3553(a) factors.  A term of supervised release must also "involve no greater deprivation of liberty that is reasonably necessary for those factors" and be "consistent with any pertinent policy statements of the Sentencing Commission." U.S.S.G. § 5D1.3. And the conditions of supervised release must also comply with constitutional limitations. *See Kerr v. Farrey*, 95 F.3d 472, 474 (7th Cir. 1996) (holding that requirement of attendance of "a substance abuse counseling program with explicit religious content" constituted "impermissibl[e] coerc[ion] . . . to participate in a religious program" and therefore violated the Establishment Clause).

When imposing conditions on supervised release, the sentencing court has broad discretion. *See United States v. Lopez*, 258 F.3d 1053, 1056 (9th Cir. 2001) (citation omitted); *see also United States v. Lovelace*, 257 Fed. Appx. 773, 774 (5th Cir. 2007) (stating that "[a] district court has discretion crafting the terms and conditions of supervised release." (citation omitted)).  *United States v. Greene*, 17 Fed. Appx. 722, 725 (9th Cir. 2001) ("The district court is free to impose conditions on supervised release which may not be related to the offense of conviction if they satisfy the other factors in the guidelines." (citation omitted)). *United States v. Barker*, 771 F.2d 1362, 1369 (9th Cir. 1985) ("Because we find, after a careful review of the record, that the district court's imposition of sentence was motivated by the desire for general deterrence to the exclusion of adequate consideration of individual factors, we vacate and

remand for resentencing.").

The following conditions for supervised release align with the Sixth Circuit's holding in *Nixon* and are supported by adequate individual facts and § 3553(a) factors:

1. The defendant must seek prior approval by the United States Probation Office or this Court in order to possess or use (either directly or indirectly) any device that can access the internet.

2. The defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendant shall consent to the installation of computer monitoring software on all identified computers and devices capable of accessing the internet to which the defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application, information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

    a. The defendant understands that any information gathered by said software may be used against the defendant in subsequent court actions regarding the defendant's computer use and the conditions of supervision.

    b. As part of the Computer and Internet Monitoring Program, the defendant shall allow probation officers to search without a warrant and without cause (including but not limited to a forensic examination), and capture evidence of violations from any communication devices (e.g. phones, tablets, computers, or devices with

       internet access or communication capabilities), email accounts, social media accounts, instant messaging accounts, or electronic communication accounts within the possession, custody, or control of the defendant up to four times per month between 6:00 a.m. and 10:00 p.m. for the entire period of supervised release.

   c. To the extent the defendant is relieved of his obligations under the Computer and Internet Monitoring Program at any point during the period of his supervised release, the defendant must provide notice to the United States Probation Office within 24 hours of opening any new online or communication accounts, including: email, social media, instant messaging, electronic communications, chat accounts or services, or other accounts that allow the defendant to communicate through electronic devices or online.

3. The defendant must seek prior approval by the United States Probation Office or this Court in order to access (either directly or indirectly) any websites or online applications.

4. The defendant shall not access, view, or use (either directly or indirectly, including printed, copied, or downloaded versions of the material) any online social media, chat services, blogs, instant messaging (including SMS or MMS), email, or other online or electronic communication applications or sites without the prior approval of the United States Probation Office or this Court.

5. The defendant shall not use any encryption services or on-line encrypted communication applications without the prior approval of the United States Probation Office or this Court.

6. The defendant shall not use any services designed to disguise, mask, or anonymize his online activity, such as Tor or other anonymizing applications, services, or sites, without the prior approval of the United States Probation Office or this Court.

7. The defendant shall not use any online gaming services or systems including, but not limited to, PlayStation, Xbox, and Wii without the prior approval of the United States Probation Office or this Court.

8. The defendant shall consult with the United States Probation Office or petition this Court if he does not know, cannot determine, or has any questions about whether an online site, service, or application is approved for him to access or use (either directly or indirectly).

9. The defendant shall refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity and from knowingly meeting or communicating with the follow persons:

    a. Any persons who are, or claim to be, associated with a foreign terrorist organization (as defined in Title 18, United States Code, Section 1189);

    b. Any person who has been convicted of any felony, with the exceptions for incidental contact; contact with any felon that may occur during a mandatory group therapy session that the defendant may be required to attend due to Special Conditions 12 and/or 13; and any contact with a convicted felon that attends the same religious services as the defendant.

10. The defendant shall submit at any time, with or without a warrant, to a search of the defendant's person and any property, house, apartment, residence, vehicle, records, computer, electronic communication devices or data storage devices or electronic media (e.g. phones, tablets, computers, or devices with internet access or communication

capabilities), social media accounts, electronic communications accounts, email accounts, or other electronic communication accounts, by a probation officer (or law enforcement officer at the request of the United States Probation Office) having reasonable suspicion concerning a violation of a condition of supervised release or a violation of state or federal law, while in the lawful discharge of the officer's supervision functions.

11. The defendant shall participate, at the direction of a probation officer, in a mental health treatment program, which may include the use of prescription medicines.

12. The defendant shall attend violent extremism counseling from providers as directed by the United States Probation Office, and agreed to by the United States Probation Office, the United States Attorney's Office for the Southern District of Ohio, and the defendant. The defendant shall also authorize the release of any mental health and/or violent extremism counseling records to the United States Probation Office.

13. The defendant shall be subject to 24-hour electronic monitoring that includes a Global Positioning System and/or Radio Frequency technology.

14. The defendant shall work in community service for 120 hours per year of supervised release as directed by a probation officer.

15. The defendant, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, shall perform at least an additional 20 hours of community service per week at the direction of the United States Probation Office until gainfully employed. These 20 hours are in addition to the 120 hours of community service the defendant must complete each year of supervised release, and will only be imposed if the defendant is unemployed as described above, and if the defendant

is not pursuing an associate degree, bachelor's degree, graduate degree, or vocational training on a full time basis.

16. The defendant shall be required to submit to periodic polygraph testing at the discretion of the probation office as a means to ensure that he is in compliance with the requirements of his supervision and/or treatment program.

17. The defendant shall surrender his United States Passport, and any passport issued by any other country, and shall not reapply for another during the term of his supervised release.

18. The defendant shall not travel outside the Southern District of Ohio without the express permission of the United States Probation Office.

19. The defendant shall continue to cooperate as directed by the United States Attorney's Office for the Southern District of Ohio throughout the pendency of his terms of incarceration and supervised release.

20. The defendant waives any right to seek modification of conditions related to the United States Probation Office's search authority and the Computer and Internet Monitoring Program for at least the first 90 months of supervised release.

21. The defendant waives any right to seek early termination until after serving at least 120 months of his term of supervised release.

These conditions of supervised release are reasonably related to the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); that the enumerated conditions do not deprive Mohamud of liberty any more than what is reasonably necessary; and are consistent with the Sentencing Commission's policy statements.

**2.      Naturalization Proceedings**

This Court expressed concern about Mohamud's false statements during immigration proceedings and asked the parties for additional information about the naturalization process for Mohamud.

To become a citizen of the United States, an individual born outside of the United States must first become a lawful permanent resident ("LPR") and remain so for five years. After the five-year period, an individual can complete and submit an N-400 application for citizenship. The submission of the N-400 starts the process of obtaining United States citizenship.

Mohamud was born in Somali in 1991 and came to the United States shortly thereafter, becoming an LPR in 1993. Mohamud was eligible to apply for citizenship after 1998; while Mohamud did not turn 18 until 2009, he was still eligible to apply for citizenship on his own behalf after the mandatory five-year period after becoming an LPR. However, Mohamud did not begin the N-400 application until 2013, shortly after communicating with at least one individual linked to a designated foreign terrorist organization, namely al-Nusrah Front, and mere months before obtaining a United States passport for the purpose of traveling to Syria in order to join al-Nusrah Front.

In October of 2013, Mohamud completed the N-400 application with assistance from the Immigration Resource Center. This application required Mohamud to provide general biographical information such as his name, date of birth, address, and contact information. In addition to this biographical information, Mohamud was also required to answer numerous questions with respect to his affiliations. Specifically, Mohamud untruthfully answered "no" to the following questions:

1) "Have you ever been a member of or in any way associated (either directly or indirectly) with: c. A terrorist organization;"

2) "Have you ever advocated (either directly or indirectly) the overthrow of any government by force or violence;"

3) "Have you ever persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular group or political opinion?"

In March of 2013, months prior to the defendant completing his N-400 application, Mohamud made several statements and actions that indicate his answers of "no" to the above-mentioned questions were deceptive. Specifically, on March 6, 2013, the defendant posted the following statement on Facebook: "The Sahaba were knights by day and monks at night now will we ever reach there height while we are in devastating fright. So oh Syria fight! We will never lose to these pagen alawyits!" PSR at ¶ 27. Mohamud's reference to "alawyits" is believed to be a reference to Alawite Muslims. As noted below, based on the facts known to the government, the United States will not be arguing for the application of the hate crime enhancement. On March 10, 2013, Mohamud updated his Facebook cover photo to an image depicting armed fighters, one of whom was holding the black flag used by the Islamic State of Iraq, Levant ("ISIL"). PSR at ¶ 27. Furthermore, on September 3, 2013, mere weeks before the defendant filled out his N-400 application, Mohamud conversed with his brother Aden, who was already fighting on behalf of al-Nusrah Front in Syria. During these conversations, the defendant stated his desire to join his brother as a mujahideen.[1] PSR at ¶ 13.

---

[1] Specifically, the defendant stated:
In the name of Allah, the Most Gracious, Most Merciful. Salam be on you and your blessed companions Al Mujahideen I'm proud of you….Allah loves the simple soldier so be a simple soldier, even if that means that no one knows who you are. All praise is to Allah who has allowed my Brother to fight in his cause. Abdifatah please know that you are fullfulling a glorious act that many of us have failed in, know that everytime you shoot your rifle, you are that much closer to Jannah so shoot and be true to Allah inn Shaa Allah I conclude with a simple piece of advise, be

On December 30, 2013, the Department of Homeland Security ("DHS"), Citizenship and Immigration Services ("CIS") approved the defendant's N-400 application. On that same date[2], Mohamud signed his N-400 application and swore an oath of allegiance to the United States, including supporting and defending "the Constitution of the United States of America against all enemies, foreign and domestic." Despite swearing to defend the Constitution of the United States in December 2013, on January 28, 2014, the defendant contacted his brother Aden about traveling to Syria and the route that he should take. PSR at ¶ 13. On February 18, 2014, the defendant was sworn in as a United States citizen at a Naturalization Oath Ceremony. Two days later, on February 20, 2014, Aden asked his brother Mohamud if his papers were in order, referring to the defendant's citizenship and passport. The defendant informed Aden that he would be able to travel in approximately one month. PSR at ¶ 13. A week after becoming a citizen of the United States, Mohamud submitted an application for a United States passport to the United States Department of State.

To obtain a passport, an individual must submit a DS-11 form to the U.S. Department of State. The DS-11 requires the applicant to provide general information including: name, address, date of birth, telephone number, occupation, parents' information, and marital status. Additionally, the applicant must detail travel plans and list emergency contact information of an individual not traveling with applicant.

In this case, Mohamud filled out his application and signed it on February 25, 2014, only one week after his naturalization ceremony. In filling out the application, the defendant failed to

---

Patient and be Humble, make dua to Allah to allow me to join you in the ranks as a Mujahid inn Shaa Allah remain, steadfast and think of Allah 24/7. WaSalam love Abdirhaman.
Gov't Sent. Mem. 3

[2] Due to defendant's improper attire, he was unable to attend the naturalization proceedings that took place on December 30, 2013. *See* Exhibit 4.

complete two sections: his travel plans and an emergency contact. However, on February 20, 2014, five days prior to submitting his passport application, the defendant discussed with his brother his intent to travel to Syria. In 2010, the defendant submitted an I-131 Application to CIS, requesting a Refugee Travel Document. Although the application was ultimately denied by CIS for the defendant's failure to appear for a biometric appointment, the defendant listed that he intended to travel to Nairobi, Kenya in June 2010, thus, providing all necessary information with respect to his travel plans on this application. Conversely, the defendant left this information blank on his passport application, all the while knowing that he intended to join his brother in Syria within a month. This could only have been done purposely, knowing that traveling to Syria would raise further questions by United States law enforcement and delays to the processing of his passport application.

**3.    Hate Crimes**

This Court also asked about the potential applicability of a hate crimes enhancement.

The sentencing enhancement enumerated in Section 3A1.1 of the United States Sentencing Guidelines is not appropriate in this case. Section 3A1.1, in pertinent part, states: "If…in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim…as the object of the offense of conviction because of the actual or perceived…religion [or] national origin…increase by 3 levels." U.S.S.G. § 3A1.1.  As noted above, Mohamud did make antagonistic comments about Alawites (who some consider to be a sect of Shia Islam) about a year before he left for overseas. The United States will not be arguing for the application of the hate crime enhancement.

However, the applicability of the victim related adjustment pursuant to Section 3A1.4(a), commission of a felony intended to promote terrorism, is substantially supported by the facts as the more applicable Guideline and has been correctly applied in this case.

Thus, a 3-level increase to Mohamud's offense level pursuant to Section 3A1.1 of the Guidelines would not be appropriate in this case.

**4.      BOP Rehabilitation Programs**

The probation office has correctly concluded that as of August 24, 2017, the Bureau of Prisons ("BOP") does not have a program that specifically targets inmates convicted of offenses related to terrorism. There are, however, resources that are generally available to inmates that could be relevant here. The BOP has conducted research that indicates that individuals convicted of terrorism-related offenses have criminogenic needs and thinking errors. It is the position of the BOP that there are programs currently in place that address these needs and errors. Individuals convicted of terrorism related charges are eligible to participate in all current programming available within the BOP; these programs include, but are not limited to: Drug Treatment, Educational Services, and Religious Services.

For the period of supervised release, the United States is also unable to recommend any rehabilitation program specifically tailored to individuals who engaged in or attempted to engage in acts of terrorism.[3] In addition, in light of the United States' recommendation of a 23-year term, any specifics regarding rehabilitation during the period of supervised release will be more effectively addressed at the conclusion of his term of incarceration.

        Respectfully submitted,

        BENJAMIN C. GLASSMAN
        UNITED STATES ATTORNEY
        SOUTHERN DISTRICT OF OHIO

        s/Douglas W. Squires
        DOUGLAS W. SQUIRES (0073524)
        JESSICA H. KIM (0087831)
        Assistant United States Attorneys
        Southern District of Ohio

        s/Joseph Gibson
        JOSEPH MILES GIBSON, JR. (0084587)
        Special Assistant United States Attorney
        Southern District of Ohio

        s/Lolita Lukose
        LOLITA LUKOSE (4176467 NY)
        Trial Attorney
        Counterterrorism Section
        National Security Division
        United States Department of Justice

---

[3] The Court asked whether the City of Columbus had any programs that could be relevant to rehabilitation here, and the United States submits that none of the many programs offered by the City of Columbus are relevant to the sentence here.